GEORGE TUTSON V. THE STATE.

No. 11435. Delivered June 28, 1928.

The opinion states the case.

*Richard W. Mayfield* of Giddings, for appellant.

*A. A. Dawson* of Canton, State's Attorney for the State.

HAWKINS, JUDGE.—Appellant was convicted of theft of a red heifer belonging to one DeGlandon. His punishment was assessed at two years in the penitentiary.

Appellant raised a question as to the election of a special judge to hold the term of court at which he was indicted and tried. The precise point was considered in White v. State, (No. 11434, opinion on rehearing June 28th) and decided adversely to appellant's contention. It is unnecessary to discuss the matter again.

It was admitted by appellant upon the trial that he took De-Glandon's animal and sold her. The issue was whether appellant took her under a mistake as to her identity with one he claimed to have authorized to get by his mother. Appellant and his mother lived in Collin County. The alleged theft occurred on the 7th day of February, 1927. Nearly three years before that appellant's father had left in the care of Isaac Thomas a cow and a calf. The father had died. On the day in question appellant appeared at the home of Thomas with two Mexicans. Appellant presented a letter purporting to be signed by his mother authorizing Thomas to deliver to appellant the two head of cattle. Thomas declined to surrender the cow, holding her for the pasturage due, but agreed to turn over the heifer. He went with appellant to find the heifer and looked several hours for her but failed to find her. This search was made openly in the day time and inquiries in appellant's presence were made by Thomas of several people about the animal. We here quote Thomas' evidence bearing on the question of identity.

"I helped him hunt the heifer. I did describe that heifer to him. I described the heifer that belonged to his mother at that time. The description I gave of the heifer, I told him she was a pale-red heifer, three years old I called her, I didn't know exactly how old she was. *I described her as near as I could by her horns, I told him her horns set straight up that way (indicating), and that she had a little crop*

*off one ear, and an underbit in the other. I am sure I told him about those marks. I am positive about that.* As to what else I told him in case he found the heifer; No sir, we didn't find the heifer in hunting for it. I told George I would have the heifer there about Friday or Saturday; I told him to come back. I knew she was around there in that neighborhood. He said all right. When he started off he said, 'Well I am going to have her before that time! I said, 'If you find her you bring her back here and get my permission to kill her, so I can identify her and have witnesses that I turned her over to you."

Upon the same point the wife of Thomas testified:

"I heard my husband describe the heifer to him that belonged to George Tutson's mother. I was sitting right by the side of him. My husband told him it was a pale red heifer, marked. I am sure he said it was marked, in both ears. I am positive he told him that. I know he told him. I also told him, I did. We told him about the mark, both of us. I did also describe the heifer to him. I did tell him the heifer was marked in both ears. * * * I told him it was a pale red heifer, marked in both ears. I am positive I told him that. I am positive my husband told him that."

DeGlandon described his animal as a "blood-red, just as red I reckon as a cow could be. She was unmarked and unbranded. * * * The Tutson heifer was not the same color as my heifer. * * * My heifer was a dark red blood colored heifer; his was a mighty pale red, more of a Jersey red like, a pale red." After Thomas and appellant failed to find the animal appellant in company with the Mexicans started out to hunt her on his own account. They made some inquiries of Jepp Miller who testified:

"They asked me about the heifer. They asked me if there was any stray cattle there, I told them no, none in there; that there was one there that belonged to Man DeGlandon. I told them it belonged to Man DeGlandon; yes. I told them she was over in Lonnie Smith's field. I told them she was unmarked and unbranded. He told me he was looking for a red heifer. He said she was marked that way (indicating). As to whether George Tutson said that: I said this heifer is unmarked and unbranded; he told me he was hunting a red heifer marked up that way. I told him DeGlandon's heifer was in Lonnie Smith's place, unmarked and unbranded. He said, 'She is not DeGlandon's but mine.' I told him 'all right, she was over there in the field, you and Man DeGlandon for it.' I saw them going in the direction of Lonnie Smith's place across my new

ground, went right there. I am positive I told him that heifer was Man McGlandon's heifer. And that it was unmarked and unbranded."

Lonnie Smith, towards whose place Miller said appellant and the Mexicans went, testified in substance that he saw appellant and his companions at witness' lot roping DeGlandon's heifer; that she was blood-red, with no horns, and unmarked; that witness knew at the time the animal belonged to DeGlandon but thought appellant had bought her; that one of the Mexicans came to witness and asked permission to butcher the animal in witness' lot, but he declined and told him to take her down in the pasture. She was sold to the Mexicans by appellant for $20.00. Appellant claimed to have taken the animal believing it was the one he was authorized to get. When asked about the distinctive marks with which Thomas claimed to have described the animal to him appellant would say, "If he told me that I don't know anything about it;" he also denied that Jepp Miller had told him the animal in Smith's field belonged to DeGlandon. The record shows that appellant was not acquainted with the animal which he claimed. The Tutson heifer had not disappeared. She was still on her accustomed range at the time of the trial.

In paragraph four of the charge the court attempted to instruct the jury upon the defensive issue as follows:

"You are further instructed that the defendant, George Tutson admits that he took the one head of cattle, referred to in the indictment, and appropriated the same to his own use and benefit but that he believed at the time that said one head of cattle was the property of his mother and his father's estate, and that he, the said defendant had permission from his mother to take the same, or if you have a reasonable doubt thereof, you will acquit the defendant, and say by your verdict, not guilty."

It is apparent from a reading of the quoted paragraph that it is not complete but that something was omitted. Appellant filed written objections thereto because it made it an issue whether appellant had permission from his mother to take said animal, and omitted to instruct the jury that if appellant took the animal under an honest belief that he was taking property in which he had an interest or which belonged to the estate of his father and mother he would not be guilty. The exception to the charge would present a serious question if the court had not given at appellant's request the following three special charges:

"You are further instructed that if a person be a part owner of property, the taking thereof does not come within the definition of theft, and if at the time of the taking of certain property a person honestly believes that it is the property of which he is a part owner, then he cannot be convicted of theft of the said property. Therefore if you find from the evidence that the defendant George Tutson, did take the animal of Man DeGlandon, but that at the time of so taking the said animal, the said George Tutson was the part owner of another animal, and that at the time of the taking, he the said George Tutson, honestly believed that the said animal which he took was the animal in which he had an interest then you cannot convict him of the theft of the said animal, and you will say by your verdict, 'not guilty.' "

"You are further instructed that if a taking be done under the belief that the same is the property of the defendant, or that it is the property of one from whom he has authority to take said property, then it is not theft. Therefore if you find from the evidence that the defendant George Tutson, took the animal of Man DeGlandon, but at the time he so took the same he took it under the honest, though mistaken belief that it was his mother's animal, then you will acquit the defendant and say by your verdict 'not guilty.' "

"You are further instructed that if property be taken openly under a fair color of title, it is not theft; if the taking though wrongful be not fraudulent it is not theft. Therefore if you find from the evidence that George Tutson the defendant took the cattle as alleged in the indictment but that when he so took the same he did so openly and at the same time under a claim to the ownership of the said cattle then you will say by your verdict 'not guilty.' "

These special charges protect in every particular appellant's rights and present all phases of his defense, and in view thereof the error in, or omission from, paragraph 4 of the main charge would not call for reversal.

No error was committed in the refusal of another special charge requested by appellant. It was in substance the same as the special charges given.

One ground of the motion for new trial was that the verdict of the jury as returned into court was not the true verdict of said jury. Appellant sought to support such averment by showing that after the jury had been discharged they handed to appellant's attorney, Mr. Mayfield, the following instrument which was signed by the twelve jurors:

"We, the undersigned, agree to give to Mr. Mayfield, attorney for the defendant George Tutson, a recommendation to the effect that George Tutson be given credit on the two years sentence of the amount of time that he has been confined in the Bastrop jail in Bastrop, Texas, and also recommend a pardon at the end of one year's sentence if the conduct of George Tutson while in the penitentiary justifies same."

The signing of said document by the jury in no sense reflects on the integrity of the verdict returned. The jury had evidently learned during the trial that appellant had been in jail for some time and were signifying an effort on their part to be helpful to him. The instrument signed by them might be persuasive with the executive branch of the government, but is not considered by us as in any way impeaching the fairness of the verdict.

Finding no error in the record calling for reversal the judgment is affirmed.

*Affirmed.*